May it please the Court, Sanford Weisbruch for Entergy Arkansas, LLC, to which I may refer occasionally as EAL for short. The Federal Energy Regulatory Commission found that EAL made the opportunity sales prudently and in good faith, but that Entergy Arkansas's affiliate, Entergy Services, misinterpreted an ambiguous provision in the filed rate concerning who, retail customers as opposed to opportunity sales customers would get the benefit of certain low-cost electricity from Entergy Arkansas's power plants. Under FERC's ruling, its retail and wholesale costs and revenues were commingled. Retail customers got the low-cost electricity from the so-called retained share power plants. Retail customers shared in the revenues from the opportunity sales. And Entergy Arkansas's responsibility for system-wide transmission costs went down, and that going down would affect both EAL as well as its retail customers. Furthermore, the opportunity sales yielded other benefits that went to retail customers. For example, a benefit that the district court did not address, despite the evidence at trial, was that the opportunity sales allowed Entergy Arkansas to forestall permanently selling off the retained share assets. It was sort of an interim measure to make some money in order to keep those assets. And then in 2003, Entergy Arkansas was able to sell some of those assets to its affiliate, Entergy Louisiana, thereby reducing its bandwidth payment obligations to Entergy Louisiana. Those payments are shared between retail customers and Entergy Arkansas, and therefore that was also a benefit to the Arkansas retail customers. Now, under the filed rate doctrine, a state utility commission is required to allow a utility to recover from its retail customers prudently incurred costs at the wholesale level. The principal argument that the district court and our friend on the other side makes is that this was a FERC-ordered remedy as opposed to the filed rate itself. But there is no such distinction. And to start, we have several cases from other circuits. Can I ask sort of a background question? Is your argument that the PSC made a mistake or that they never should have decided this question? The Arkansas PSC is entitled to give a retail rate and discuss the mechanisms. For example, Entergy Arkansas asked to recover this amount over a two-year period. There could be alternatively a one-year period or a three-year period. The Arkansas commission has some discretion in that respect. What it does not have discretion to do is to trap the wholesale cost and prevent it from being recovered at all. They allowed 0% of the cost to be recovered from retail customers. And that was something that they did not have discretion for. Well, okay. So is the answer they should not have decided this, FERC should have decided it? Or is your answer they just decided it wrong? They decided it wrong to the extent, well, let me step back to the FERC level for a second. It is commonplace, and here both FERC and on direct review the DC circuit said, FERC, you don't have to decide the preemption consequences of your ruling. FERC said, we're not going to decide that. The DC circuit said, that's okay. What it falls to to decide that is a future court where that issue is squarely raised. We did raise that at the Arkansas commission. We explained, look, this is a wholesale level cost. You're required to let us recover it. They, of course, disagreed with us. We think that they, to answer Judge Grunder's question, they got it wrong in that respect. And the district court also got it wrong. This is a cost, and we've cited numerous cases, the Energy Louisiana case from the Supreme Court, the AEP case from the Texas District Court affirmed by the Fifth Circuit. Both of those cases involved sort of complicated transactions with wholesale customers, retail customers, and the core holding is that where you have an interstate tariff that is approved by FERC, that a wholesale level cost has to be allowed to be recovered. I'd like to go, if I could, to the district court, as well as the APSC's central error in our view, which is this supposed distinction between a FERC-ordered remedy and the filed rate. And what I'd like to say is that there is no such distinction. This court in Williston-Basin, as well as its sister circuits in the Boston-Edison case and the Towns of Concord case, those were from the first in the DC circuit, respectively, hold that a remedy ordered by FERC, a compensatory remedy to enforce the filed rate, is part of the filed rate doctrine. And indeed, the Arkansas Commission itself has agreed with this proposition. In appendix 153, paragraph 25, this is the stipulated facts at trial, it recites an episode where for the 2005 year, Energy Arkansas made its bandwidth payment to the other operating companies. And there was subsequently a dispute at FERC that said, hey, that payment was too low. And FERC agreed. It raised that payment by $68 million. Energy Arkansas made that payment, and then it said, we'd like to recover the appropriate share from retail customers. The Arkansas Commission didn't say, hey, that's a remedy. We don't have to allow that to go through. They didn't say anything. They allowed it to go through, to be passed through under the normal allocation, approximately 95% at that time, to retail customers. So we have not only this court, sister circuits, as well as the Arkansas Commission itself in that case, which is 2015 Westlaw 306712. It's cited in our reply brief at page 13, note 6. All of those precedents hold that a remedy is part of the filed rate. Now, there's an additional sort of gloss that they attempt on appeal, which is, well, FERC had discretion to order a remedy. Now, keep in mind that FERC's remedy was designed by FERC's explicit acknowledgment to put the parties in the same position they would have been had Energy Arkansas originally done this the right way, according to FERC. It's a compensatory, not a punitive remedy. The fact that there's discretion involved in whether to order even a compensatory remedy does not take this outside of the filed rate doctrine. On that score, we've cited the Energy Louisiana case from the Supreme Court, where the filed rate conferred discretion on the utility to make a determination. That didn't take it outside the filed rate doctrine. We've also cited by analogy the Kansas v. Nebraska case from an interstate compact. That's a U.S. Supreme Court decision. Again, there, the U.S. Supreme Court exercised remedial discretion, and that was held to be preemptive. Can I ask a question about the, you said the remedy was to put everyone back in the same position that they would have been had your client read the service agreement properly, or as FERC later interpreted it. So, going back to that point, you've said in your opening statement that the retail customers got benefit from these opportunity sales. Isn't that one of the things? But did they get a benefit in the amount they were paying for their service, for their utilities? Well, they certainly, if I'm understanding Your Honor's question, they receive electricity. That's a benefit. I guess what I'm thinking is, didn't the shareholders get the benefit from some of these opportunity sales, right, from the lower cost energy sales? Sure. So, this is an extremely important point, which we respectfully think the district court got wrong. Under the pre-FERC interpretation, okay, the Energy Arkansas shareholders did keep the revenues, and they also were allowed to use the low-cost electricity to source those opportunity sales. But FERC came along, and it announced what the filed rate always meant, right? We got it wrong, but FERC's saying, here's what it meant. And when FERC says what it meant, it commingles everything between retail and wholesale. So, Energy Arkansas, even though it's paying the fixed cost of these retained share resources, no longer gets the low-cost electricity to supply the opportunity sales. Instead, that goes to retail customers. And the revenues from the opportunity sales, this is a crucial point, under the original interpretation were being kept by the shareholders. Under the revised interpretation, they were shared. And in fact, in several of the years, and this is at our opening brief, we have a chart showing this, page 57. If you look in 2006, 2007, and 2009, retail customers are better off under the FERC interpretation than under the Energy Arkansas interpretation. And to go back to my original remark, FERC said that these were prudent sales. It said it was an ambiguous provision. Yeah, I guess, and I appreciate your answer. I'm still just trying to figure out in terms of whether or not the retail customers are required to kick back in to pay that damage remedy. What I'm trying to figure out is what you mean by the retail customers got a benefit from the opportunity sales. Because it seems to me that if they were paying less as a retail customer because of these opportunity sales, then you've got a point. But that's not what I'm understanding the benefit to the retail customer to be. It's not the same kind of benefit that the shareholder got. Or am I wrong? So they are benefiting under the FERC interpretation in three out of the ten years. They also are benefiting by being supplied by electricity. Now the fact that's. Well, but we're talking about how to pay back a remedy, not like, oh, I'm benefited because I've got electricity today, I think. Let me try to answer it in this way. And it's something that I haven't brought up yet, but it's another very important point here. There were two components to this remedy. There was the unadjusted refund of approximately $81 million without interest. And then there was the bandwidth offset of approximately 13.7. The Arkansas Commission said you have to send the good part, which is the bandwidth offset. That has to be shared almost entirely with retail customers. And yet the costs that caused that bandwidth offset, because there's this ripple effect. It's explained in our briefs. I probably don't have time to go through it now. But they're inextricably intertwined. The bandwidth offset does not exist without the unadjusted refund. And yet somehow the Arkansas Commission thought it was appropriate that retail customers would get the bandwidth offset, 13.7 million approximately, but share in none of the costs that led to that. What I'd like to close my opening remarks is on transcript 207, a point that we don't think has been refuted either by the district court or by our friend on the other side, our expert explained that if Energy Arkansas had done this the right way originally, if it had correctly interpreted this ambiguous provision the right way originally, then those costs that would have flowed from that would have been shared under the appropriate Arkansas percentages, approximately 86% to retail, 14% to wholesale in the first place. So all that Energy Arkansas is asking for in this lawsuit is to follow FERC's thread to the retail level, which is to say, let's put everyone in the same position as if they had not misinterpreted this ambiguous provision, which again they did in good faith and prudently. All we're trying to do is put everyone back in that position. The other operating companies all passed through the net amount, that is the unadjusted refund and the bandwidth offset to their retail customers. Why is it that Arkansas alone among all of those other states is only passing through the bandwidth offset? That is an error under the file rate doctrine. I'll reserve the rest of my time if the court does not have further questions now. Thank you. You're very welcome. Good morning. May it please the court. My name is John McCaffrey, appearing on behalf of Defendants Appellees Doyle Webb, Katie Anderson, and Justin Tate, who are the Chairman and Commissioners of the Arkansas Public Service Commission. With me is my colleague Denise Zosa. As we've heard, Entergy Arkansas contends that the file rate doctrine principles announced in Nantahala by the U.S. Supreme Court in that case's progeny control this case. But that position is wrong for two reasons. First, as the District Court correctly found, the file rate doctrine does not apply in this case because the FERC order damages, which the Arkansas Commission disallowed, were not part of a FERC file rate. They were, again, damages imposed upon Entergy Arkansas for violation of a file rate, and those damages flowed to the other Entergy operating companies. The mechanism FERC used to identify the level of those damages was to rerun the intrasystem bill, the mechanism where they allocate costs under the file rate, but it wasn't an application of the file rate itself. That was the District Court's core conclusion, and this Court can affirm on that basis. Second, as we also discussed in the brief, the FERC order damages were not incurred to provide retail service. As explained in the briefs, the damages arose out of wholesale sales, which Entergy Arkansas made, and as the Court has noted, the wholesale sales were made to off-system wholesale customers. The company had agreed, only made those sales to offset the costs of the excluded assets, which it had agreed to be responsible for. It made the off-system sales to cut down on any losses it would have from being solely responsible for those assets. So the costs were incurred entirely in connection with providing wholesale service. It wasn't in connection with securing power for retail customers. Under Nantahala, therefore, the file rate doctrine principles announced in Nantahala don't apply. I'd like to clarify, it's probably important to take a step back and talk about what the file rate doctrine is. The file rate doctrine is a term that gets thrown around. At its most basic level, it means that courts and state commissions, and even FERC, cannot apply a file rate other than one that's been on file and approved by or accepted by FERC. In this case, as we're using the term, and under Nantahala, there's an extra step. The file rate doctrine means that if a cost has been incurred by a utility who purchases wholesale power, as counsel has indicated, it can be applied in different situations. But the basic idea is if a utility that serves retail customers purchases energy under a FERC-approved tariff at a certain price, and then turns around and tries to pass those costs through to its retail customers who it's serving with that power, the state commission cannot say, well, that rate that FERC approved was too high, so we're going to disallow a portion of those costs. It's that cost-trapping component, and whether or not that applies. It's not a gloss on the file rate doctrine, but it's an extra step in this case. So when we just say the file rate doctrine applies, you have to think about that extra step. Whether or not the cost are the kind that state commissions can consider. Here, the company cites basically, they argue that FERC has authority to, well let me take a step back, the court, the company does not cite a single case where a court has held that if FERC orders damages for a file rate violation, that those damages then must be flowed through by a state commission under the Nantahala line of cases. They don't cite a single case that says that. What they do cite is they cite the Williston case from this circuit. They cite Boston Edison from the First Circuit, and Towns of Concord from the D.C. Circuit. All those cases say is that FERC has authority to order refunds, discretionary authority to order refunds when they find a violation of the file rate. Those cases do not say that, do not go the extra step, because the issue was not posed in those cases, whether or not a state commission considering those damages would then have to flow them through to state retail rate payers. Entergy Arkansas characterizes the district court opinion as imposing an improper retail customer benefit test. We would acknowledge, in general, under Nantahala, you don't look to retail customer benefit. But in this case, what the court was doing was it was evaluating whether or not these were actually costs associated with serving retail customers. So when it talks about the factual record, that the costs were undertaken solely to offset the costs of the excluded assets, assets that Entergy Arkansas had agreed to be responsible for, the benefits from those sales flowed to shareholders and retail customers didn't get the benefit of that power, which is an important aspect of this case. The sales at issue here took place over the period, or the misallocation of costs took place during the 2000-2009 period. So during that period, Entergy Arkansas rate payers were paying retail rates under the original accounting. Entergy Arkansas was misallocating the costs under the tariff. FERC ultimately found that and said, well, we have to make sure the other Entergy operating companies are made whole. But FERC actually said this case is not about making all other, putting all rate payers back in the situation they would have been. It's about making the other Entergy Arkansas companies, putting them back in the place they would have been if the off-system sales, the opportunity sales had originally been accounted for properly. So FERC calculated that refund, but that was a damages calculation. That was a counterfactual, as FERC said, a counterfactual situation. Judge Kelly, to your question, I didn't mean that the rates that Entergy Arkansas rate payers somehow magically changed from 2000 to 2009. FERC just reallocated the costs to determine what would have happened had Entergy Arkansas not misallocated the costs in the first place, identified the damages, and then required those costs to be flowed through to the, or passed on to the other Entergy operating companies. On the issue of discretion, as we said, as I said, Entergy Arkansas relies on basically three cases. The Williston case, the Boston Edison case, and the Towns of Concord case. Those cases actually show, we would submit, that a refund order from FERC to enforce a filed rate is not part of the filed rate itself. In fact, if it was part of the filed rate itself, there wouldn't be any discretion, and FERC wouldn't have to act under Section 309 of the Federal Power Act, which is the statutory source of that equitable discretion. Does it matter that it was calculated based on the filed rate, the service agreement? I think ultimately, not for this question, FERC could have said, hypothetically, FERC could have chosen some other method to identify how, the harm to the other Entergy operating companies. So, the fact that FERC chose to rerun, actually chose to use the tariff, the interest system bill mechanism to identify the costs that were improperly charged to the Entergy operating companies. As a legal matter, Your Honor, no, I don't think it does matter, because again, this was a damages calculation by FERC. It didn't reset the rates for purposes of the Entergy Arkansas retail customers. In fact, even though Entergy Arkansas claims that these cases completely support its position, it really ultimately falls back on policy arguments. The company falls back on policy arguments. They basically just say, this ought to be the case. It doesn't make sense not to apply the filed rate doctrine to a damages calculation. But the facts of this case show why it does indeed make sense. There were a lot of, there were all kinds, as the lengthy record shows, there were all sorts of extenuating circumstances in this case. The company, in particular, the company had agreed to be responsible for these wholesale, for the portion of their generating assets. And they were going to retain the benefits of any sales from those assets, and likewise would not share in the benefits of those sales with retail customers. They got the allocation wrong. And the benefits that were originally retained by shareholders, now once FERC said, well, Entergy Arkansas misallocated those costs, and the company now comes back to the Arkansas Commission, and it's the same pot of dollars. The overcollection, the amount that was originally retained by the shareholders, to your question, Judge Kelly, the amount that was retained by the shareholders, and then was required to be flowed back to the other Entergy operating companies. Entergy now turns around and says, well, we had to pay that money back, but so now our shareholders are going to be out. So now Arkansas retail customers, you have to pay for it. Even though we, even though the company originally agreed that those costs would be, would be, that the assets associated with those, the costs and benefits of those excluded assets would be retained by the company. And so, so when opposing counsel talks about the benefits, and I'm not talking about sort of the retail benefit test, just sort of what they would have gotten, the retail customer, what did, what did, what was the perk for them that they have to pay back now, in terms of the original accounting? You're saying the shareholders were getting the benefit of this sort of asset, I guess what, you said they were taking responsibility for the assets and then they could sell them so the shareholders get that benefit, right, of their, of that increase. So what, when opposing counsel is talking about the retail customers, sort of I'll just say benefits, air quotes, what is that? Do you think there is one in that? As an accounting matter, as an accounting matter, if the, the, the excluded assets tended to be lower cost assets. And so Entergy Arkansas' argument is by, by hypothetically reallocating some of those lower cost assets to retail customers. In other words, more under the rerun, more low, lower cost energy was reallocated to retail customers. That's, that's the benefit they're focusing on. At the same time, the, the retail customers are now being asked to pay for the all effectively of the higher cost opportunity sales. And, and, and to, to counsel's point about, we didn't dispute the evidence or the testimony by Mr. Louisel that if this, if, if, if the situation had been the same originally, then customers in Arkansas would have, would have paid for exactly the cost that they're now seeking to pass through. That's a completely counterfactual situation. And it's, and, and, and the statement of the brief is that, that customers would pick up an appropriate portion of those costs. It's not clear what an appropriate portion of those costs would have been under this completely counterfactual situation. In fact, the record indicates, and this is, this was in the DC circuit decision, there wasn't any dispute actually that Entergy Arkansas wouldn't even have made these sales if this had been the original accounting. Because it wouldn't have been economically prudent to do so. So again, this idea that FERC is just doing, FERC is just, just putting everyone back in the place they would have been in the first place. Or, or if, if the misallocation hadn't occurred, that's completely counterfactual. And it results in much higher burden on retail rate payers. On the, on the bands, on the bandwidth, I'm, I know I'm almost out of time. The key thing there is that there's no inconsistency between in the district court's ruling. What happened with the bandwidth adjustment is unlike the costs of the excluded assets where the benefits and revenue, benefits flowed to share, flowed to shareholders. With the bandwidth adjustment, as the record shows, retail customers actually were impacted by higher bandwidth payments because of the misallocation. Whereas the, whereas the, most of the costs, the opportunity sales costs were, were, were isolated and flew to, flowed to, to shareholders without any impact on retail customers. The bandwidth misallocation did adversely impact retail customers through the, through the retail rates as a function of the production cost allocation mechanism. I see I'm out of time unless there's any further questions. Thank you. Thank you. The bandwidth offset, which Arkansas was more than happy to claim for its retail customers, rested on the same calculations that my friend on the other side derides as counterfactual and hypothetical. So there really is no dispute there. In terms of the testimony at transcript 206, 207, my friend on the other side says that, well, we didn't specify what the appropriate percentage to retail. We absolutely did. Mr. Louisel testified it would be approximately 86% for the unadjusted refund and approximately 95% for the bandwidth offset. Furthermore, in our complaint and the answer, paragraphs 43 of both, there was no dispute that the traditional Arkansas allocation percentages were 86 and 14. We haven't left that to chance. We're applying traditional factors. Now, in terms of precedent, yes, I disagree that we rely just on policy. I'd just like to briefly quote Boston Edison. Under the filed rate doctrine, FERC can enforce the terms of a filed rate and order refunds for past violations of one. But beyond that, we relied heavily on the AEP case, which they didn't address in their brief, didn't address it today. AEP involved the question of whether wholesale revenues would or would not be shared with retail customers, okay? And the district court in the Fifth Circuit ended up affirming the utility's determination not to share $15 million. It's hard to say that that $15 million, which doesn't get shared, is somehow a retail benefit. The retail benefit, respectfully, is not a gateway to this doctrine. What is a gateway to this doctrine is whether there is a commingling of retail costs and revenues with wholesale costs and revenues. And I want to go back to sort of a brief, very brief history. If we go back to what got this all started, it was a decision by this court in the Middle South case, which, by the way, we also cite on the Dormant Commerce Clause. But the Arkansas Commission's order was trying to exclude costs of Grand Gulf, which was a high-cost nuclear plant. And this court said, no, you can't do that under the Dormant Commerce Clause. In the wake of that, Entergy Arkansas made a deal. And it said, look, we're going to recover approximately 80% of Grand Gulf, and later other assets, we're going to recover approximately 86%. But the quid pro, we're going to take those fixed costs away from retail customers. The quid pro quo is we are entitled to the low-cost electricity from that. That was the deal. It's in 1985 and 1997, two settlement agreements. And FERC comes along, and it upends that arrangement. And it says, no, you cannot source the opportunity sales using that low-cost electricity. So to hear my friend on the other side saying, well, Entergy Arkansas is trying to escape from its deal. The deal cannot be enforced anymore under FERC's ruling. And why is that important? We come back to the filed rate doctrine. Everything starts with FERC's interpretation of the filed rate. Under that interpretation, the revenues are shared. The low-cost electricity goes to retail customers. And last thing is he said that, well, these were imprudent. They never would have been made. FERC decided in this case, Appendix 614, that these were prudent. It's not open to this court or to my friend on the other side to question that at this point. Prudent costs should be allowed to be recovered at retail. That's the essence of the filed rate doctrine. We respectfully request reversal. Let me ask this. I understand the filed rate is used to calculate the damage in this case, correct? Correct. But it seems to me that the question of who bears the burden here, the rate payers or your shareholders, is an independent question of that. What am I missing there? Because it seems to me you're saying they're dependent. And then if I can just finish up, if they are, in fact, independent questions, how do you get into federal court to challenge what the PSC did? Okay. Let me start with that one real quick. We get into federal court because under this court's decision in Middle South, which is similar to other decisions in other circuits, there is subject matter jurisdiction to raise a federal preemption claim as to an order of Arkansas Commission agency. Okay. But that goes back to my very first question, I think, is what I asked you is who made, what are you challenging? Should FERC have made this decision? Or were they wrong in their decision? That's what I asked in the beginning. Sure. They were wrong in their decision. It is not incumbent upon FERC, and indeed it is commonplace for FERC not to address the preemptive consequences of this decision. I would cite Mississippi Power and Light as an example of that, where FERC didn't even address prudence there. But the Supreme Court said, well, they... But if this question of who bears the burden is not a filed rate question, how do you get into federal court? I mean, it seems to me that's go to the state courts and say the PSC was wrong. Who bears the burden is indeed a filed rate question. And here's why. Because these are wholesale level costs. They are the total cost to supply all of Entergy Arkansas's customers. Okay. They're incurred at the wholesale level. They must be allowed to be passed through. And in terms of how you divide those up, and I point to the Entergy Louisiana situation, what they did with their receipt of money in this transaction, they allocated it between their wholesale and retail. What they cannot do, and the floor of that is 86% and 14%, what they cannot do is say, no, it's 0%. You recover 0% from retail. That violates the filed rate doctrine. All we're trying to do is enforce the traditional Arkansas allocation percentages, transcript 206 to 207, under the filed rate doctrine. Thank you, Your Honor. Okay. Thank you. Very complex case. We appreciate your briefing and argument today and cases submitted. We will issue an opinion in due course.